## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LINDA A. GRAVELY**<br>**14415 Colonel Fenwick Court**<br>**Upper Marlboro, Maryland 20772,** | ) ) ) ) |
| **Plaintiff,** | ) ) |
| **vs.** | ) **Civil Action No.**<br>) |
| **W. SCOTT RAILTON, CHAIRMAN**<br>**OCCUPATIONAL SAFETY AND HEALTH**<br>**REVIEW COMMISSION**<br>**1120 20th Street, N.W.**<br>**Washington, D.C.  20036,** | ) )  **JURY TRIAL DEMAND**<br>) ) ) |
| **Defendant.** | ) ) |

## COMPLAINT FOR UNLAWFUL EMPLOYMENT PRACTICES

### I.    Preliminary Statement

1.  Plaintiff, Linda A. Gravely, seeks redress for unlawful employment practices and retaliation perpetrated by Defendant Occupational Safety and Health Review Commission (hereinafter, "OSHRC" or "Review Commission") in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991, as amended.  Consequently, Plaintiff demands declaratory and injunctive relief, back pay, compensatory damages, and other appropriate relief, legal and equitable, against the Defendant Review Commission.  Plaintiff demands a jury trial.

### II.   Jurisdiction and Venue

2.  The jurisdiction of this Court is invoked to secure the protection of and to redress the deprivation of rights secured to Plaintiff by Title VII of the Civil Rights Act of 1964, as amended, (Supp. II, 1991), which provides for injunctive, equitable and other

relief against discrimination in employment on the basis of race, sex, religion, national origin and color, and by the Age Discrimination in Employment Act (ADEA). Plaintiff has met all jurisdictional prerequisites for bringing this action.

3. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. Sections 1331, 1343(3) and (4), and this Court's pendent jurisdiction, this being a suit authorized and instituted under the Civil Rights Act of 1964, as amended, and 28 U.S.C. Sections 2201 and 2202.

4. This proceeding is instituted in the United States District Court for the District of Columbia pursuant to 28 U.S.C. Section 1391, as the judicial district in which the cause of action arose and in which the Defendant is located and doing business.

### III. Parties

5. Plaintiff, Linda A. Gravely, is a Afro American (Black) female citizen of the United States, over 40 years of age, residing in Prince George's County, Maryland, who at all time relevant hereto was, employed as a Public Affairs Specialist, GS-1035-14 and later as a GS-1035-12, by the Review Commission, working in the Commission's offices at 1120 20th Street, N.W., 9th Floor, Washington, D.C. 20036.

6. Defendant, W. Scott Railton, was the Chairman of the U.S. Occupational Safety and Health Review Commission, an independent federal agency, at all times relevant to this Complaint.

### IV. Statement of Facts

7. Plaintiff is a married, African American (Black), female, born August 3, 1951 who received a B.S. Degree in Journalism from Northwestern University in 1973, has experience as an award winning newspaper reporter, who has 28 years of successful

federal service, all of which, except four (4) months was with the Review Commission.

8.   Plaintiff started her employment with the Review Commission as a writer in August 1978 and was promoted to Supervisory Public Affairs Specialist, GS-1035-11, in or about June 1980.  As a result of her outstanding performance and increasing responsibility over the years her grade was increased to GS-1035-14.

9.   During the course of her employment with the Commission, Plaintiff served under seven different Review Commission Chairmen covering both parties, and was promoted to a GS-11, to a GS-12, to a GS-13, and then to a GS-14 in or about 1998.

10.   During the course of her employment with the Review Commission, Plaintiff received numerous Quality Step Increases ("QSI's), two "Chairman's Awards," a Hammer Award from the Vice President's Office, and a commendation from the National Association of Government Communicators.

11.   As a result of Plaintiff's successful performance of her duties, she also served as the Agency's Freedom of Information Act (FOIA) Officer, like the previous Public Information Officer.   Subsequently, as a result of her continuing successful performance, later Review Commission Chairmen enlarged the scope of her responsibilities to include serving as records management officer, and the implementation and maintenance of the OSHRC website.

12.   In or about August 2002, W. Scott Railton was appointed to the Review Commission, and in or about September 2002, Railton became Chairman of the Commission.

13.   Due to rumors and public statements by Chairman Railton that the Review Commission was going to take various actions that would adversely affect minorities,

females and older OSHRC employees, Plaintiff went to her supervisor, the Executive

Director, and expressed her concern about discrimination.

14.  She also spoke out about the discrimination against minorities, females and

older Commission employees to several Review Commission employees, the designated

EEO counselor, and to one of the Commissioners.

15.  Subsequently, Chairman Railton announced that the Review Commission would

undertake a study of the Agency by Federal Management Partners (FMP).  After hearing

rumors that the study had been completed, Plaintiff requested a copy of the study from

the Executive Director.  Plaintiff was not given a copy of the study, or allowed to see it.

In fact, the Executive Director informed Plaintiff that when she inquired about the study

Chairman Railton said that she (Executive Director) would never see it.

16.  Plaintiff informed her supervisor that she had shared her complaints and

concerns about discrimination with her co-workers, because other minorities, females and

older workers were afraid to say anything for fear of retaliation.

17.  This was not the first time Plaintiff had spoken out about the racism, sexism

and aged based discrimination, as well as the hostile work environment, that she was

experiencing since Railton's appointment as Commission Chairman in 2002.

18.  Plaintiff had previously complained to her supervisor that the Chairman had

shouted at her in a loud and offensive voice, publicly embarrassing and humiliating her.

19.  In September 2002, the Chairman embarrassed and humiliated Plaintiff when

he stood in the hall, near Plaintiff's office doorway, and shouted at her for sending an

email to her supervisor. Plaintiff tried to explain to Railton that the "cc" was the typical,

courtesy copy, routinely sent to keep her supervisor abreast of what she was doing.

However, Railton shouted at her and commanded her not to do it again because it was "none of her [supervisor's] business."

20. Following this incident, Plaintiff complained to several staff attorneys and others that Railton had spoken to her in such a manner because of her sex and her race. None of the previous Commission Chairmen had ever engaged in such conduct. She explained to them that this was consistent with his reputation before he became Chairman. Plaintiff was visibly shaken.

21. Several members of the OSHRC staff, the Executive Director, and management in general, including the Chairman, were aware of Plaintiff's complaints about discrimination and the hostile and threatening work environment created by the Chairman.

22. On a subsequent occasion, within days after complaining about discrimination, the Chairman took Plaintiff's one support staff person away, and she was informed that she was not to use the temporary secretarial worker who was sitting at her assistant's desk.

23. Plaintiff complained about discrimination/retaliation to the Executive Director and other staff again in 2002 when the Chairman removed her as website manager and reassigned responsibility for the website to a white male. This was the agency website that Plaintiff had developed, implemented and managed since its inception in 1997.

24. In response to the Executive Director's attempt to split the website duties between the white male and Plaintiff, the Chairman sent the Executive Director a memo asking "what is it that she did not understand" about his removal of Plaintiff as website manager and the reassignment to the white male.

25.  Plaintiff complained to the Executive Director, staff attorneys and Commissioner Rogers again in 2002 about the hostile and discriminatory work environment. Prior to this complaint, the Chairman had hollered at the Plaintiff, publicly embarrassed her, and humiliated her because a Northern Virginia newspaper failed to pick up his full nomination as Chairman, although it had been sent to them repeatedly.

26. During this outburst, the Chairman shouted loudly and repeatedly at Plaintiff while asking her "Who is the Chairman?" He did not allow Plaintiff the opportunity to explain that although the press release on his nomination and elevation was picked up by all the standard and specialty press from organizations which normally cover the Review Commission, the naming of the head of an agency the size of OSHRC was generally not picked up in northern Virginia.

27.  Plaintiff attempted to tell the Chairman about the extra efforts she had made to have his name mentioned in the newspaper, but he continued to holler at her and told her that she did not know what she was doing. He further told Plaintiff that he did not like how she ran her operation and that there would be some changes made.

28.  Plaintiff spoke out about discrimination/retaliation to management and staff on numerous occasions from 2002 until her position was abruptly abolished in 2006.

29.  As a result of the Chairman's discriminatory treatment of Plaintiff, and in retaliation for her speaking out and complaining about discrimination, starting in January 2003 and continuing through 2006, the Chairman subjected her work to excessive and overbearing scrutiny, wrote insulting comments on her written work and allowed staff to see them.

30.   On one particular occasion, Plaintiff , using language previously approved, had explained the agency's adjudicatory mission in a routine letter responding to a public inquiry.  Railton found this description to be inadequate.  He expressed his disapproval by sending Plaintiff a letter, via staff, in which he stated, "It's a surprise after the years you've been here that you still do not know what we do."  Plaintiff was mortified by the Chairman's remarks since the description used had been approved by the previous chairmen, or their executive directors.

Furthermore, Plaintiff had authored an article and three agency publications in which she explained what OSHRC did.  Plaintiff was humiliated.

31.   In February 2003, Chairman Railton's unreasonable and excessive scrutiny of Plaintiff's work continued when she submitted the FOIA annual report. The report's format followed Department of Justice guidelines for all federal agencies; however, the Chairman wanted figures for a category, "unrecompensed costs," which the agency did not have a system in place to track, and had never reported.

32.   In October 2003, the Chairman continued to write insulting remarks on Plaintiff's work.  After reviewing Plaintiff's letter to a Congressional staffer who wrote OSHRC by mistake, Railton wrote to Plaintiff "Is this suppose(sic) to be a joke?" The format of the letter used by Plaintiff had been used by seven previous chairmen and, not only did it answer the Congressional staffer's question, but  Plaintiff also provided even more information in an effort to follow previous suggestions from Railton that he wanted more information in such documents.

33.   Plaintiff complained to the executive director about her treatment by the Chairman being discriminatory and in retaliation for her having spoken up about his

discriminatory treatment of her and the staff.  Later Plaintiff's voice, which had been selected through an Agency competition, was removed from the OSHRC voice mail system, and for days she received numerous calls asking if she had left the agency, another humiliation.

34.  In the spring of 2005, Plaintiff learned of the announcement of yet another management study by the Chairman and complained to the executive director and other management officials about the discriminatory effect of various actions being taken by the Chairman, and how they were discriminating against her, and other older, female and minority employees.

35.  At that time, Plaintiff again requested a copy of the first study (FMP study) from the executive director, and indicated that she would like to see the second study when it was completed.

36.  Subsequently, Plaintiff requested the documents under the Freedom of Information Act (FOIA) to show that the Chairman's actions were discriminatory and without justification.

37.  Out of fear of retaliation, Plaintiff made the FOIA requests for the studies through her attorney.  However, OSHRC refused to provide any substantive information, imposed outrageous fees and estimated costs, until challenged, ultimately produced a copy of the FMP study that was so heavily redacted that it was meaningless, and refused to produce the second (Connie Harshaw, the contractor) study.

38.  Management knew that Plaintiff had made the FOIA requests for the studies, and thereafter the Chairman's excessive scrutiny of Plaintiff's work intensified, as well as his retaliatory actions towards her.

39.  Plaintiff's routine access to agency case files was restricted, and routine requests from Plaintiff to appropriate offices for case files needed to answer public inquiries were sent to the Chairman's Special Assistant and Legal Adviser, Richard Loeb.

40.  Routine questions from reporters, that Plaintiff normally handled, had to be funneled through the Chairman's Special Assistant, and others.  Answers to routine questions were not provided to Plaintiff so that responses could be consistent and uniform when reporters called her.

41.  Plaintiff was denied routine information, including but not limited to the number of new cases received in a given period, the number of OSHRC cases appealed to the Circuit Courts, and the status of cases off-site.

42.  Every simple routine thing that Plaintiff had done for 27 years without problem and without hassle was scrutinized.  Even simple updates to the numerous professional directories that she had received and routinely updated had to go to Loeb, who rarely got to things that Plaintiff left him in a timely manner.  According to Loeb, everything that Plaintiff did was wrong.

43.  Plaintiff submitted a routine report that was returned with an e-mail stating only "unacceptable," without any reason(s) being given, no editing, no rewriting on the pages, or notations in the margins.  This was not normal based on Plaintiff's 27 years with the Review Commission.   The report came from Chairman Railton, via Loeb, just "unacceptable."

44.  Reporters continued to call Plaintiff as the established, long standing press contact point, but Chairman Railton and Special Assistant Loeb made it impossible for her to function as she had in the past.  The reporters would call to confirm the accuracy of

Railton and Loeb's statements, but Plaintiff was unable to comment.

45.   Plaintiff continued to speak out about how OSHRC policies and practices were discriminating/retaliating against her, and older, female, and minority employees; she continued to speak out about these policies and practices to the executive director, staff attorneys, and other persons.

46.   Following Plaintiff's comments about discrimination, in the spring of 2005 Loeb instructed Plaintiff not to talk with print media reporters, even though she was the public information specialist, down graded from public information officer.

47.   In August 2005, Plaintiff was removed as the OSHRC Freedom of Information Act Officer, and her duties were reassigned to a white male.

48.   In September 2005, Plaintiff's position was downgraded from a GS-14 to a GS-12, although she had successfully performed her duties.

49.   From 1978 until 2003, Plaintiff regularly received performance appraisal ratings from the Review Commission, which were usually either "Exceeds Fully Successful" or "Outstanding," and had never been rated less then "Fully Successful."

50.   However, one element of Plaintiff's performance appraisal covering December 2003 through September 2004 was rated "minimally successful" since, according to Railton, he had received some publications late.  These were publications, such as "Inside OSHA," were sent to the Review Commission, addressed to Plaintiff's attention. Plaintiff normally forwarded these publications to the Chairman and other staff after she reviewed them.  However, Railton wanted to get them first, but did request that a change in the past procedure be made.  Moreover, this was not one of Plaintiff's performance elements.

51. Once again, Plaintiff complained to the Executive Director that Railton's placing of unfounded remarks on her performance appraisal was another example of his discrimination/retaliation against her for continuing to speak out against his discriminatory treatment of minorities, women, and older employees.

52. Plaintiff had been given increased responsibility by previous agency chairmen; however, Railton reassigned many of Plaintiff's responsibilities. In August 2005 Plaintiff was removed as OSHRC's Freedom of Information Act Officer. A month later, Plaintiff's position was downgraded from a GS-14 to a GS-12, even though she had successfully performed her duties over an extended period of time and had received two Chairman Awards and a Hammer Award for her writing and teamwork.

53. In early fall of 2005, the executive director met with Plaintiff and reviewed her performance appraisal in which the supervisor had rated Plaintiff's performance as "Fully Successful" for the period through September 30, 2005.

54. On September 15, 2005, Plaintiff filed a complaint with the OSHRC EEO counselor, an administrative assistant, and requested an appointment for EEO counseling, but no action was forth coming.

55. In January 2006 when the executive director took a detail, Richard Loeb, the Chairman's Special Assistant, took over her duties. Plaintiff, through her attorney, appealed one of the several denials of her FOIA requests for information on the management studies; she was then subjected to even more discriminatory and retaliatory treatment by the Chairman and Loeb.

56. On January 18, 2006, Loeb gave Plaintiff her Performance Appraisal for the previous year (October 1, 2004 to September 30, 2005). Even though the executive

director had previously rated Plaintiff's performance as "Fully Successful," Loeb had

extended her performance appraisal period for 90 days and had down graded Plaintiff's

performance rating in every category from what the executive director had rated her,

giving her a "Minimally Successful" overall rating.

57.   Loeb did not come to the Commission until the spring of 2005, around March

or April, and became Plaintiff's immediate supervisor when the executive director left for

her detail in January 2006.  Yet he rated her down from what the executive director had

given her in every category for the entire rating period.

58.   Plaintiff refused to sign the performance appraisal from Loeb, submitted a

rebuttal memorandum and complained to the OSHRC EEO counselor that this was a

continuation of the retaliation against her for speaking out about the discrimination

against her, and other female, minority and older workers.  But after a few days the EEO

counselor claimed that she could not find the memo from Plaintiff.

59.   On January 19, 2006, Loeb called Plaintiff into his office and gave her a notice

of a proposed three day suspension for accepting an envelope, since no one was at the

front desk, containing the FOIA appeal letter submitted on her behalf by her attorney.

60.   Plaintiff's office was near the front reception desk, and it was the practice in

the office that if no one was at the reception desk that any available employee in the area

could accept the delivery.  Plaintiff already had a copy of the appeal letter from her

attorney prior to its delivery.

61.   Plaintiff, through her attorney, and pursuant to the notice of proposed

suspension requested to review the documents and information on which the proposed

suspension was based.  The Commission refused to make the file available when

Plaintiff's attorney came at the scheduled time to review it, but later stated that there were no documents.

62.    After Plaintiff's attorney made written submissions on her behalf, and a meeting with the Chairman and his counsel, the Chairman withdrew the proposed suspension.

63.    Within three days after the Chairman withdrew Plaintiff's suspension, Plaintiff was notified in writing that her position was being abolished and that she had to be out of her office and off the Review Commission premises within two days.

64.    The FMP study, nor the second management study by Harshaw, called for the Plaintiff's position to be abolished, or for her to be put off the OSHRC premises.

65.    During Chairman Railton's tenure, Plaintiff was shouted at and publicly embarrassed and humiliated, insulted by management's conduct and comments which were made known to the OSHRC staff, discriminated against and retaliated against for speaking out against the discrimination against her, and other female, Black and older employees.

66.    During Chairman Railton's tenure, Plaintiff was subjected to a discriminatory and hostile work environment which included among other things the Chairman shouting and hollering at her and other female, minority and older employees, cursing and publicly abusing, embarrassing and humiliating her and other minority, female and older employees.

67.    The discriminatory actions and conduct of the Review Commission Chairman were know to the other Occupational Safety and Health Review Commissioners during their tenure.

68.  OSHRC Commissioners were aware of the fact that Chairman Railton had created an unhealthy and hostile work environment at the Review Commission.

69.  At least one Commissioner has pointed out that based on frequent complaints from both former and current senior management staff about Chairman Railton's abusive and erratic behavior, and substantial staff turnover, there was a real sense that the work environment over the past four (4) years has been unhealthy.

70.  During his tenure as Review Commission Chairman, Railton publicly, and in private, shouted at and humiliated Plaintiff, questioned her professionalism and accused her of spreading rumors.

71.  Chairman Railton wrote notes and comments about Plaintiff on memorandum to her supervisor and to Plaintiff which were demeaning, humiliating and offensive.

72.  Chairman Railton frequently shouted, publicly and privately, at Plaintiff and other older, African American and/or female Review Commission employees, humiliating and embarrassing them, and subjected them to his public ridicule.

73.  Chairman Railton publicly engaged in loud, aggressive, demeaning and offensive behavior towards an older African American employee, and others, causing them to be humiliated and embarrassed, and creating a confrontational, volatile, disruptive and unhealthy work environment.

74.  The Chairman interrupted meetings between staff with loud, nasty and abusive language forcing staff members to leave so that he could pursue his own interest.

75.  In meetings with employees, Chairman Railton frequently engaged in loud, humiliating and abusive behavior towards older, Black, and female employees, and this conduct was rumored and generally known to Plaintiff and other staff members.

76. On information and belief, the work environment created by the Chairman was so hostile and volatile that one Commissioner called a meeting with Railton and the other Commissioner to express concern about the unhealthy and hostile work environment he was creating.

77. On information and belief, Chairman Railton frequently hollered loudly and cursed at older, and/or Black and/or female Review Commission employees, and on one occasion Railton hollered and cursed so loudly that some OSHRC attorneys wanted to call the police.

78. It was generally rumored that Chairman Railton also engaged in abusive, aggressive, embarrassing and erratic behavior towards Black and older Review Commission employees during Commission meetings, and this situation was such a concern that he was advised to go off the record since Commission meeting are tape recorded.

79. The Chairman's conduct towards Plaintiff and other older, African American and female employees created an unhealthy and hostile work environment at the Review Commission.

80. The Chairman's conduct towards Plaintiff and other older, and/or African American, and/or female OSHRC employees, and the hostile environment he created caused Plaintiff to suffer physically, emotionally and financially.

## V.  FIRST CAUSE OF ACTION
### (Employment Discrimination)

81. Plaintiff realleges the allegations of Paragraphs 1- 80 again as if fully set forth herein.

82.  Plaintiff was treated differently in the terms and conditions of her employment due to her race, age and sex by the Defendant in violation of Title VII of the Civil Rights Act of 1964, as amended.

82.  Plaintiff was treated differently in the terms and conditions of her employment and retaliated against by the Defendant because she spoke out against discriminatory policies and practices against older (over 40) employees, African Americans and women in violation of Title VII of the Civil Rights Act of 1964, as amended.

83.  Plaintiff was treated differently in the terms and conditions of her employment because she sought information about policies and practices which she believed had a discriminatory effect against older (over 40) employees, African Americans and women in violation of Title VII of the Civil Rights Act of 1964, as amended.

84.  Plaintiff was treated differently in the terms and conditions of her employment and retaliated against by the Defendant for speaking out against policies and practices which had a discriminatory effect on older (over 40) employees, African American and female employees, and created a hostile and unhealthy work environment in violation of Title VII of the Civil Rights Act of 1964, as amended,.

85.  On or about January 18, 2006, Plaintiff timely sought employment counseling for discrimination and retaliation, and on or about March 20, 2006 timely filed a formal complaint of discrimination and retaliation with the Occupational Safety and Health Review Commission (OSHRC).

86.  Subsequently, Plaintiff requested a hearing before an Equal Employment Opportunity Commission Administrative Judge, but now has decided to pursue her claim in Federal court.

87. Plaintiff's EEO Complaint was filed on or about March 20, 2006, and has been pending in the agency administrative process almost a year and half, well over 180 days.

88. Plaintiff has exhausted all administrative prerequisites prior to filing this lawsuit under Title VII of the Civil Rights Act of 1964, as amended.

## VI. SECOND CAUSE OF ACTION
### (Retaliation)

89. Plaintiff realleges the allegations of Paragraphs 1- 80 again as if fully set forth herein.

90. Plaintiff was treated differently in the terms and conditions of her employment and retaliated against by Defendant because she spoke out against, and complained about, discriminatory policies and practices, including policies and practices which had, or would have discriminatory impact on older (over 40) employees, African Americans and women in violation of Title VII of the Civil Rights Act of 1964, as amended.

91. Plaintiff was treated differently in the terms and conditions of her employment and retaliated against by Defendant because she filed an EEO complaint.

92. On or about January 18, 2006, Plaintiff timely sought employment counseling for discrimination and retaliation, and on or about March 20, 2006 timely filed a formal complaint of discrimination and retaliation with the Occupational Safety and Health Review Commission (OSHRC).

93. Subsequently, Plaintiff requested a hearing before an Equal Employment Opportunity Commission Administrative Judge, but now has decided to pursue her claim in Federal court.

94. Plaintiff's EEO Complaint was filed on or about March 20, 2006, and has been pending in the agency administrative process almost a year and half, well over 180 days.

95. Plaintiff has exhausted all administrative prerequisites prior to filing this lawsuit under Title VII of the Civil Rights Act of 1964, as amended.

## VII. THIRD CAUSE OF ACTION
### (Hostile Work Environment)

96. Plaintiff realleges the allegations of Paragraphs 1- 80 again as if fully set forth herein.

97. Defendant, and the actions and conduct of its Chairman, created and perpetuated a hostile, discriminatory, retaliatory and unhealthy work environment in violation of Title VII of the Civil Rights Act of 1964, as amended.

**WHEREFORE** Plaintiff, Linda A. Gravely, respectfully prays this Honorable Court to advance this case on its docket, Order a jury trial at the earliest practicable date, and cause this case to be in every way expedited, and upon such hearing to:

A. Issue a declaratory judgment that Defendant's acts and practices complained of herein violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended;

B. Order Defendant to make Plaintiff whole for the discrimination and retaliation, and hostile work environment which she suffered as a result of the acts and practices as described herein, by providing appropriate back pay and other wages and benefits in the amount to be shown at trial;

C. Grant Plaintiff judgment against Defendant for damages in the amount of $300,000 for mental anguish and emotional distress inflicted on Plaintiff as a result of the aforementioned and retaliatory acts and practices, and the hostile and unhealthy work

environment to which she was subjected.

    D.   Grant Plaintiff judgment against the Defendant awarding Plaintiff attorney fees and costs for all proceedings; and

    E.   Grant such other and further relief as the Court deems necessary and proper.

**JURY DEMAND**

Plaintiff demands trial by jury.

    Respectfully submitted,

Nathaniel Baccus, III
1629 K Street, N.W., Suite 300
Washington, D.C.  20006
(202) 349-1688

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Linda A. Gravely   85866 | W. Scott Railton, Chairman, Occupational Safety and Health Review Commission |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Prince George's | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Washington, D.C. |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Nathaniel Baccus, III<br>1629 K Street, N.W., Suite 300<br>Washington, D.C. 20006<br>(202) 349-1688 | Case: 1:07-cv-01895<br>Assigned To : Kennedy, Henry H.<br>Assign. Date : 10/19/2007<br>Description: Employ. Discrim. |

JURY ACTION

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

◉ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENShip OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**   OR   ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

③

| ○ G. *Habeas Corpus/*<br>*2255* | ⊗ H. *Employment*<br>*Discrimination* | ○ I. *FOIA/PRIVACY*<br>*ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)** | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)** | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ K. *Labor/ERISA*<br>*(non-employment)* | ○ L. *Other Civil Rights*<br>*(non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original  ○ 2 Removed  ○ 3 Remanded from  ○ 4 Reinstated  ○ 5 Transferred from  ○ 6 Multi district  ○ 7 Appeal to
Proceeding      from State        Appellate Court    or Reopened      another district      Litigation        District Judge
                  Court                                                  (specify)                                from Mag. Judge

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Title VII, Civil Rights Act of 1964, as amended, Employment Discrimination and Retaliation Case    42USC 2000

| **VII. REQUESTED IN**<br>**COMPLAINT** | CHECK IF THIS IS A CLASS<br>ACTION UNDER F.R.C.P. 23 ☐ | **DEMAND $** 300,000 | Check YES only if demanded in complaint<br>**JURY DEMAND:**    YES ☒    NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S)**        (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.
**IF ANY**

DATE ~~September 4,~~ *October 19,* 2007    SIGNATURE OF ATTORNEY OF RECORD    *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.